IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| Christian F. Matlock, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | CIV. A. NO. _____ |
| CONDUENT COMMERCIAL SOLUTIONS, LLC, AND CONDUENT BUSINESS SERVICES, LLC. | § § § § § | |
| *Defendants.* | § § § § | JURY DEMANDED |

## ORIGINAL COMPLAINT AND JURY DEMAND

Christian Faith Matlock complains of Conduent Commercial Solutions, LLC's and Conduent Business Services, LLC's violations of federal and state law forbidding discrimination and retaliation in employment. Defendants' actions and omissions concerning Matlock's employment violate the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act, 42 U.S.C. § 12101, *et seq.*; the Family Medical Leave Act of 1993, as amended, 29 U.S.C. § 2601, *et seq.*; and the Texas Commission on Human Rights Act ("TCHRA"), as amended, TEXAS LAB. CODE § 21.001 *et seq.*

# I.    OVERVIEW

1.    Conduent Commercial Solutions, LLC ("CCS") and Conduent Business Services, LLC ("CBS")(together, "Defendants" or "Conduent") employ thousands of Americans (and still thousands more workers outside the United States) in call centers supporting some of the world's largest and highest-profile brands like Apple. Conduent claims teamwork and collaboration as being among its core values; indeed, Conduent says that these values are "the hallmarks of [its] culture."[1] Although it publicizes an embrace of diversity and inclusion, where "everyone feels valued and included," its employment practices reflect the harsher and darker side of the modern, global economy. In or about June 2020, Conduent's practice was to cull from its workforce employees with medical issues, disability accommodation requests, and/or medical leave requests. This practice was against the backdrop of Conduent's emphasis on the costs borne by the come from employee medical leave and the guidance to supervisors to "performance manage" employees with ADAA and FMLA issues out of the company.

2.    Conduent's    unlawful    disability    and    family-medical-leave discrimination continued into or about the summer of 2020. Conduent carried out a so-called reduction-in-force in which most of the employees (four out of five) had recent disability accommodations, FMLA leave, or both. One of the

---

[1] LIFE AT CONDUENT (available at:  https://jobs.conduent.com/life-at-conduent/)(last visited: Jun. 22, 2021).

employees impacted was a Tier 2 supervisor from Anna, Texas, named Christian ("Faith") Matlock. Matlock suffers from Fibromyalgia, a painful disease that impacts and restricts many aspects of her life. Matlock had worked through Conduent's personnel and Human Resources systems since at least August 2019. As she prepared to return from approved FMLA leave and to renew the ADA accommodations that would allow her to continue to her good performance for Conduent, the company terminated her by email on or about June 18, 2021.

3.     This is an action to remedy unlawful employment practices in violation of the ADA, the FMLA, and the Texas Commission on Human Rights Act. Conduent's discrimination and retaliation inflicted significant harm on Matlock—even as she struggled with her health issues and to support her family—for which she now seeks to be made whole. Worse, Matlock's termination along with at least four other Customer Care Supervisors with health, disability, and/or medical leave issues is part of the company's pattern and practice of violating state and federal disability discrimination and family-medical-leave laws. In addition to other remedies, Matlock seeks equitable relief necessary to end Conduent's unlawful employment practices and protect other employees who merely wish to exercise their rights under these critical laws.

## II.    PARTIES

4.    Christian Faith Matlock is a citizen of Texas residing in Coppell, Dallas, County Texas.

5.    Matlock at all relevant times was a "qualified individual with a disability" under the ADA. This is because Matlock had been performing the essential functions of her job before her medical diagnosis and continued to perform all essential functions of the job with or without reasonable accommodations.

6.    Defendant Conduent Commercial Solutions, LLC ("CCS") is a foreign limited liability company, licensed to and doing business in Texas. CCS did business in Texas at all times material to these claims—including by employment Matlock and others in Texas—and continues to do substantial business in the State of Texas. The causes of actions asserted below arose from and are connected to purposeful acts by CCS and its agents during and after Matlock's employment. CCS may be served with process on its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

7.    Defendant Conduent Business Services, LLC ("CBS") is a foreign limited liability company, licensed to and doing business in Texas. CBS owns Conduent Commercial Services, LLC, and did business in Texas at all times material to these claims—including by employment Matlock and others in Texas—and continues to do substantial business in Texas. The causes of

actions asserted below arose from and are connected to purposeful acts by CBS and its agents during and after Matlock's employment. CBS may be served with process on its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

8.    When Matlock alleges that CCS or CBS acted or omitted to act, she means that its officers, directors, principals, vice-principals, agents, servants, and/or employees committed the act or omission within the course and scope of that individual's agency or employment and with the employer's full authorization, ratification, or approval.

### III.    JURISDICTION AND VENUE

9.    This is an action for employment discrimination and retaliation in violation of the ADA and the FMLA. This court has original jurisdiction to hear the merits of these claims under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12117(a), 42 U.S.C. § 2000e(5)(f), and § 29 U.S.C. 2617. The court has supplemental jurisdiction over the Texas Labor Code claims under 28 U.S.C. § 1367.

10.    CCS and CBS do substantial business in this district and division and are subject to personal jurisdiction here. Specifically, CCS and CBS have had—and have—a working presence throughout the State of Texas (and the United States), and Plaintiff Matlock worked in Anna, Texas, in this district and division, throughout her employment with Conduent. A substantial

portion of the acts and omissions leading to Matlock's claims—including the unlawful termination—occurred while Matlock worked remotely from Anna, Texas. Venue is therefore proper in this district and division under 28 U.S.C. § 1391.

11.     Matlock has satisfied all jurisdictional pre-requisites under the ADA, the TCHRA, and the FMLA.

## IV.     FACTUAL BACKGROUND

12.     CBS, formerly a Xerox company until about 2017, is a multinational business process services company, headquartered in Florham Park, New Jersey. Conduent customers include most of the Fortune 100 companies and hundreds of government entities who contract with Conduent to provide manage their business processes and essential interactions with end users. CBS, through CCS and other wholly owned subsidiaries, employs tens of thousands of workers in the United States (with more working overseas) in its call centers supporting Conduent's business clients' customers, among them Apple.

13.     CCS was at all relevant times an "employer" under the ADA, the TCHRA, and the FMLA. *See* 29 U.S.C. § 2611; 42 U.S.C. § 2000e(b); TEXAS LABOR CODE § 21.002(8). CCS employed more than 500 employees in 2019-2020.

14.     CBS was at all relevant times an "employer" under the ADA, the TCHRA, and the FMLA. *See* 29 U.S.C. § 2611; 42 U.S.C. § 2000e(b); TEXAS

LABOR CODE § 21.002(8). CBS employed—and continues to employ—50 or more people within a 75-mile radius of the location where Matlock worked. CCS employed in 2019-2020 more than 500 employees.

15.    From at least April 2019 onward, Matlock was an "eligible employee" as defined by the FMLA, 29 U.S.C. § 2611.

16.    CCS and CBS are an integrated enterprise, or alternatively, they were Matlock's joint employer. They are jointly and severally liable for Matlock's claims.

17.    At all relevant times Conduent was aware of its duties under federal and state law to prevent and remedy discrimination in the workplace, and to provide family-medical leave. Supervisors in Conduent's call centers maintain spreadsheets of employees documenting ADA accommodations and FMLA and disability leave. Conduent should have been fully conscious of the risks of disability bias and/or family-medical leave bias in its workplace. Indeed, reflecting this understanding, Conduent declared to the United States Equal Employment Opportunity Commission that it "makes all personnel decisions … in a non-discriminatory manner and in accordance with applicable laws."[2]

18.    Despite its awareness of and obligations under the law, Conduent places almost no emphasis on worker protections likes anti-discrimination

---

[2] *See* STATEMENT OF EQUAL OPPORTUNITY, NON-DISCRIMINATION, & HARASSMENT POLICY, ADAAA POLICY, AND ADAAA PROCESS INSTRUCTIONS, submitted to the EEOC on or about December 4, 2020.

laws and policies. Training on non-discrimination and non-retaliation practices and protections is perfunctory, at best, and this lack of emphasis filters down to employment decisions.

19.     Conduent hired Matlock as a Technical Support Advisor (Tier 1), *i.e.*, a Remote Customer Care Assistant, effective on or about March 9, 2018. Conduent assigned Matlock to a call center handling customer-service calls for Apple's customers.

20.     After about six months of good performance and solid evaluations, Conduent promoted Matlock to Tier 2 Supervisor in or about October 2019.

21.     Matlock suffers from Fibromyalgia, which is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory, and mood issues. According to the U.S. Centers for Disease Control and Prevention (CDC), Fibromyalgia affects about four million U.S. adults, roughly two percent of the adult population.[3]

22.     The ADA Amendments Act of 2008 (ADAAA) applies to Matlock's disability discrimination claims. *See* Pub. L. 110-325, § 8, 122 Stat. 3553 (Sep. 25, 2008), codified at, e.g., 42 U.S.C. § 12101, *et seq*. Under the ADAAA, Matlock's disability must be assessed in its active state, not in remission. 42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(vii). In addition, her disability

---

[3]     The CDC information on Fibromyalgia is available at: https://www.cdc.gov/arthritis/basics/fibromyalgia.htm.

must also be assessed without regard to mitigating measures like medical treatment. 42 U.S.C. § 12102 (4)(E)(i); 29 C.F.R. § 1630.2(j)(1)(vi).

23.     Similarly, the TCHRA's expanded disability definition, which became effective September 1, 2009, apply to these claims. Under the amended TCHRA, Matlock's disability must be "construed in favor of broad coverage" and assessed in its active state "without regard to the ameliorative effects of mitigating measures…." TEX. LABOR CODE § 21.0021.

24.     In its active state, Matlock's physiological condition, Fibromyalgia, is a disability as defined by the ADA[4] and the TCHRA[5] because it substantially limits her in various major life activities, including, for example, performing manual tasks, sleeping, walking, standing, bending, concentrating, and working. It also impacts the operation of major bodily functions like the neurological and nervous system.

25.     Matlock's doctor first diagnosed myalgia and related symptoms in or about the summer 2009 and began treatment for it. Matlock's doctor later diagnosed Fibromyalgia after extensive testing, in or about January 2020.

26.     Matlock advised her supervisor, Operations Manager (OM) Elizabeth Romanovich, about her medical issues and asked for an accommodation in or about July 2019. Matlock said, among other things, that

---

[4] As amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, eff. Jan. 1, 2009.

[5] As amended by Acts 2009, 81st Leg., ch. 337 ("Employment Rights of Certain Individuals with Disabilities"), eff. Sep. 1, 2009.

she needed a scheduled ending earlier in the day and a laptop (rather than desktop) because sitting and standing had become difficult due to pain and swelling. Matlock also asked for approval for intermittent leave for when flareups occurred. On or about July 2, 2019, Matlock asked Romanovich to start the company process for approving ADA accommodations. Matlock went through the company's formal process for FMLA approvals.

27.   Conduent approved FMLA leave—namely, intermittent FMLA leave up to two days per month and 15-minute breaks as needed—and ADA accommodations in or about December 2019.

28.   Although Conduent eventually approved the ADA accommodations request, Conduent managers and Human Resources made the accommodation request process difficult and frustrating. Matlock experienced pushback from both, and most everyone she spoke to about the accommodation request seemed irritated by me. Romanovich later told Matlock that Stephanie Herring, Senior Manager—Delivery (Romanovich's boss) was irritated and felt that Matlock was "stirring up problems" by talking to other supervisors about my health issues. Conduent only approved the accommodations after Christmas 2019—over three months since her initial request. In the meantime, Matlock had several severe, painful flare ups. One of those episodes was so painful that she was unable to work that day.

29.   In or about early January 2020, Conduent supplied the laptop that Matlock requested as an accommodation over four months earlier.

30.     In or about January 2020, Matlock received her 2019 performance evaluation. Her managers rated her as meeting expectations.

31.     Around the time of the performance evaluation, Matlock started working under the scheduling accommodation. The revised schedule was Monday through Thursday, 7 a.m. to 6 p.m. The earlier end time helped relieve some of the pain and swelling from the long days; the three days off allowed her body time to rest; and the weekend days off allowed her to make doctors' appointments on days when a friend or family member could drive me to appointments (because Matlock rarely drivers herself any longer due to the pain of siting in cars for extended periods).

32.     In or about March 2020, Matlock went on FMLA leave to deal with a family-member's health issues. Upon returning to work in or about late March, Matlock experienced an even heavier-than-normal workload. The longer hours and heavy workload caused more pain and more frequent Fibromyalgia flareups. Consequently, Matlock felt the need to look for alternatives within Conduent that would reduce the painful health impacts of her current job. Matlock began asking Romanovich (her manager) and the head of Human Resources, Cordelia Guevarra, if she could transfer to Human Resources, Quality Assurance, or some other role. After several requests, Romanovich eventually said that Conduent needed Matlock as a supervisor because there were not enough supervisors in their business line. Romanovich said that they could not find anyone willing to do the job.

33.     On or about April 15, 2020, Matlock submitted a new, revised ADA request for accommodation. Romanovich and Herring were made aware of the accommodation request because the process requires their approval. Matlock understood that the ADA accommodations approved at the end of 2019—the scheduling one, in particular—were set to expire in or about July 202. Because of that, Matlock wanted to get that process under way in plenty of time, and she renewed the accommodation request.

34.     As the work and work-related anxiety increased, Matlock's Fibromyalgia flare ups also got worse. Matlock sent Romanovich an email on or about May 4, 2020, saying that the extra duties being assigned were increasing her anxiety and causing more flare-ups. Matlock said that she needed to discuss changing the accommodations and the FMLA intermittent leave approval.

35.     Around this time, several other supervisors (Ashley Rogers and Arrena Dotch) and Matlock had chat conversations discussing their working conditions, their health situations, and medical-leave issues, and how the work environment was not conducive for certain health issues and disabilities. Somehow management found out about these discussions, and Matlock and the others learned that Operations Managers (like Stephanie Herring) were monitoring some (or all) of their screens during these concerted activities (ie, the discussions about our working conditions and health issues).

36.     On about May 19, 2020, Matlock received notification that her recent ADA accommodation request was under review. Later that morning Herring and another Operations Manager, Athena Ruddick, wrote Matlock up based on shortcomings experienced by other supervisors (who had not had FMLA covered absences in the time period). She said that, while Matlock's team's performance in earlier weeks was excellent, Matlock had missed some deliverables the week before. In the discussion that followed, Operations Manager Stephanie Herring suggested (for the first time) that "this may not be the job for [Matlock]."

37.     Matlock needed to seek treatment and asked for paid-time off (PTO), which was approved. Her leave started on or about May 25, 2020 (although she continued to answer email and text messages and to complete other tasks).

38.     While on leave, Matlock's doctor started her on new medication that caused severe drowsiness. Matlock was sleeping most of the day at first, and so she needed more time to adjust to the new medications. In consultation with her doctor, Matlock decided to ask for continuous FMLA leave on or about June 4, 2020.

39.     Shortly after filing the FMLA/STD claim with Conduent's claims processor, Matlock got surprising information that Garrett Swalwell, who was on my team, would be taking her position because, according to the information, Matlock would not be coming back. This was news to Matlock. To

Matlock's observation and understanding, Swalwell does not have a disability or a record of a disability. Matlock is not aware that he had taken FMLA-covered leave since the beginning of the year.

40.     On or about June 15, 2020, Conduent's administrator (MetLife) notified Matlock over the phone that her FMLA request was approved.[6]

41.     On or about June 17, 2020, Matlock spoke with Romanovich to explain her leave status and address how the leave was being coded in the payroll system. Romanovich asked by email (10:34 a.m.) what Matlock's return-to-work plan was. Matlock responded (10:41 a.m.) that once her doctors had the results from recent MRI and GI testing, she would have a better timeframe for my return to work. Matlock said that tentatively that she expected to be back by August 3, 2020, or in about six weeks. Romanovich responded: "Please keep me posted and let me know your go forward plan. I really hope you are feeling better."

42.     On or about June 17, 2020, Matlock received an email from Human Resources saying that the system showed her on leave until August 30, 2020.

43.     On or about the next day, Conduent terminated Matlock by email. The termination was effective July 2, 2020.

---

[6] Based on discussions with Human Resources and/or the FMLA administrator, Matlock understood that she had over 400-450 hours of available FMLA leave at the time.

44.     Conduent's termination of Matlock was not performance related because Matlock had solid performance reviews and performance metrics showed that my team was among the top-performing teams week after week. To cover for the discriminatory and retaliatory decision, Conduent's termination email said (falsely) that Matlock's "position [had] been eliminated." This was false and a pretext for discrimination and retaliation.

45.     Conduent's decision to terminate Matlock was part of a broader pattern of basing employment decisions on protected characteristics like disability status, FMLA status, and protected conduct. It was also part of Conduent's pattern of basing personnel decisions on impermissible disability stereotypes.

46.     Conduent terminated at least three other Tier 2 Supervisors and one Facilitator in this supposed reduction-in-force (RIF) in or about June 2020. Conduent terminated Ashley Rogers, Arrena Dotch, Jaquet Harkless, and Shannon Harding, in addition to Matlock. Each had medical issues in this time period, either disability accommodation requests, FMLA leave requests, or both.[7]

47.     Conduent apparently used the RIF as an excuse to get rid of employees with health and medical problems.[8] This was consistent with

---

[7] Harding may also have had a pending sexual-harassment or other type EEO complaint when terminated.

[8] On information and belief, at least two of the other women included in the June 2020 "RIF" filed charges with the United States Equal Employment

Matlock's own experience. She observed the heavy emphasis managers placed on the money the company lost when employees did not come to work due to FMLA and medical leave. Stephanie Herring stressed in monthly staff meetings—as late as April 2020—that ADAAA and FMLA approvals were costing too much money. The guidance that Matlock's supervisors gave was that she needed to "performance manage" employees with ADAA and FMLA issues out.

48.    In a letter dated June 23, 2020, Conduent's administrator (MetLife) notified Matlock that her FMLA request for absences between June 5, 2020, and July 17, 2020, was approved.

49.    Conduent's refusal to accommodate Matlock's disease, its disability bias, and retaliation for her protected conduct has caused—and is causing—real hardship for Matlock and her family. The harms are financial, as she struggled to support her family without her Conduent compensation and benefits. The harms are also non-monetary, as she struggles with her disease with the added anxieties, stresses, depression, and pain caused by the abrupt and unjust job loss. Conduent's illegal conduct caused Matlock, among other harms, anxiety, stress, sleeplessness, mental anguish and emotional distress, and other non-economic injuries. On a professional level, Conduent damaged Matlock's reputation, among other harms.

---

Opportunity Commission complaining of discrimination and/or retaliation by Conduent in their termination.

50.     On or about August 31, 2020, Matlock filed a charge of disability discrimination and retaliation against Conduent with the United State Equal Employment Opportunity Commission and the Texas Workforce Commission – Civil Rights Division. More than 180 days have elapsed since, and the EEOC issued a right-to-sue notice on or about March 31, 2021. Matlock requested a notice of right to sue from the Texas Workforce Commission on or about June 22, 2021. Matlock has exhausted all administrative prerequisites to filing suit under the ADA and the TCHRA.

### V.     CAUSES OF ACTION

**COUNTS ONE AND TWO:      DISABILITY DISCRIMINATION UNDER THE ADA AND THE TEXAS LABOR CODE**

51.     Matlock incorporates by reference paragraphs 1 through 50.

52.     Congress enacted the ADA after finding that "unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to purse those opportunities for which our free society is justifiably famous." Congress also found that disability discrimination "costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." *See* 42 U.S.C. § 12101(a). Consequently, the ADA makes it an unlawful for employers to "discriminate against a qualified individual on the basis of disability in regard to … [the] discharge of employees, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

53.     Similarly, the TCHRA prohibits employers from "discharg[ing] an individual, or discriminat[ing] in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment" because of the individual's disability. TEX. LABOR CODE § 21.051.

54.     By virtue of her experience, education, knowledge, skills, training, and ability, Matlock was qualified to perform the Tier II supervisor job (with or without reasonable accommodation), and she did so to Conduent's satisfaction for over a year.

55.     Due to Fibromyalgia, Matlock is substantially limited and significantly restricted in one or more major life activities, including but not limited to, performing manual tasks, sleeping, walking, standing, bending, concentrating, and working. It also impacts the operation of major bodily functions like the neurological and nervous system.

56.     The ADA dictates that "disability" should be construed "in favor of broad coverage …." 42 U.S.C. § 12102(4). Matlock is a qualified individual with a disability within the protections of the ADA, as amended by the ADAAA.

57.     Matlock is also a qualified individual with a disability within the protections of the TCHRA as amended.

58.     Since about July 2019, when Matlock informed her managers about her health issues, CCS and CBS regarded Matlock as having or likely to develop a physical impairment within the meaning of the ADA and the TCHRA.

59.     CCS's and CBS's actions and omissions are unlawful disability discrimination under the ADA. CCS and/or CBS terminated Matlock because of her disability. CCS would not have decided to terminate Matlock at the time that it did had she not been a qualified person with a disability and/or a record of disability, without regarding her as disabled, and/or without acting on impermissible disability bias and stereotypes.

60.     CCS's and CBS's actions and omissions are also unlawful disability discrimination under the TCHRA. CCS and/or CBS terminated Matlock because of her disability. Matlock's disability and/or her record of disability was a motivating factor in CCS's and CBS's decision to terminate Matlock at the time that it did had, CCS and CBS acted on impermissible disability bias and stereotypes.

61.     Alternatively, CCS and CBS regarded Matlock as disabled and terminated her because of an actual or perceived physical impairment.

62.     CCS and CBS knew that their actions violated the ADA and the TCHRA or were reckless in disregarding Matlock's statutory rights.

**COUNTS THREE AND FOUR:        RETALIATION AND
                                INTERFERNCE UNDER THE ADA**

63.     Matlock incorporates by reference paragraphs 1 through 62.

64.     In enacting the ADA, Congress aimed to secure the ADA's primary objectives "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance [the law's] basic

guarantees." *Cf. Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006). Consequently, the ADA makes it an unlawful for employers to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]" and to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of … her having exercised or enjoyed, or on account of … her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected" under the ADA." 42 U.S.C. § 12203.

65.     Matlock engaged in protected activity by, among other actions, notifying her managers of her disability and requesting reasonable accommodation(s) for that disability. Only weeks before Conduent terminated her Matlock asked to renew her ADA accommodations.

66.     CCS's and CBS's acts and omissions, as described above, were unlawful under the ADA. CCS and CBS terminated Matlock because of protected activity and otherwise interfered with her exercise of rights under the ADA. Rather than comply with their obligations to prevent and remedy disability discrimination, CCS and CBS preempted Matlock's renewed accommodation request (and interfered with her rights) by terminating her because of her disability and accommodation request. CCS and CBS would not have terminated Matlock at the time had she not exercised her rights under the ADA. 42 U.S.C. § 12203(a). In doing so, CCS and CBS "coerce[d], intimidate[d], threaten[ed], [and/or] interfere[d]" with Matlock's "exercise or

enjoyment" her ADA right and "on account of … her having exercised [and] enjoyed" ADA rights. 42 U.S.C. § 12203(b). Moreover, CCS and CBS knew that their actions violated the ADA or were reckless in disregarding Matlock's statutory rights.

**COUNT FIVE:**          **RETALIATION UNDER THE TEXAS LABOR CODE**

67.     Matlock incorporates by reference paragraphs 1 through 66.

68.     The TCHRA also makes it "an unlawful employment practice if the employer… retaliates or discriminates against a person who… (1) opposes a discriminatory practice; makes or files a charge; files a complaint; or testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE §21.055.

69.     Matlock engaged in protected activity by, among other actions, requesting reasonable accommodation(s) for her disability and otherwise asserting her rights under the Texas Labor Cod. *See, e.g., Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271 (2009); *see also Quantum Chem. Corp. v. Toennies*, 47 S.W. 3d 473, 476 (Tex. 2001)(noting that one of the TCHRA's purposes is to execute the policies of federal equal-employment opportunity law and therefore analogous federal statutes and cases guide courts in interpreting the TCHRA). CCS and CBS unlawfully retaliated against Matlock by, among other unlawful actions, terminating her because of her protected activity. CCS and CBS knew that their actions

violated the Texas Labor Code or acted with reckless disregard for Matlock's statutory rights.

**COUNT SIX:**               **INTERFERENCE UNDER THE FAMILY MEDICAL LEAVE ACT**

70.     Matlock incorporates by reference paragraphs 1 through 69.

71.     Congress enacted the Family Medical Leave Act in 1993, among other reasons, to "balance the demands of the workplace with the needs of families…" and to "entitle employees to take reasonable leave for medical reasons…." 29 U.S.C. § 2601(b). This was due, in part, to a finding that "there [was] inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods…." 29 U.S.C. § 2601(a). The FMLA therefore makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA.  29 U.S.C. § 2615(a)(1).

72.     Matlock was an "eligible employee" of CCS and/or CBS within the FMLA's meaning at all relevant times. *See* 29 U.S.C. § 2611(2). Consequently, the FMLA entitled her to certain rights, including the right to 12 weeks of protected leave for a "serious health condition" and to "be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. § 825.214. An employee is entitled to reinstatement even if the employer "replaced [her] or … her position has been restructured to

accommodate the employee's absence." *Id.* Employers have the burden to show that an employee "would have been laid off during the FMLA period and, therefore, would not be entitled to restoration" when an employee is "laid off" during FMLA-protected leave. *See* 29 C.F.R. § 825.216.

73.    Since about August 2019, Matlock had a "serious health condition" under the FMLA. *See* 29 U.S.C. § 2611(11).

74.    Matlock was on FMLA-covered leave at the time of her termination in or about June 2020.

75.    CCS and CBS unlawfully interfered with, restrained, and/or denied Matlock's enjoyment of her FMLA rights in violation of the FMLA, 29 U.S.C. §2601, *et seq.* CCS and CBS violated the FMLA by, among other acts or omissions, interfering with Matlock's rights under the FMLA, terminating her for taking protected FMLA leave, failing and refusing to maintain employer-provided health benefits, and failing or refusing to restore her to her position or an equivalent position upon returning from protected family-medical leave.

76.    CCS and CBS lacked any good-faith basis for its actions or omissions and should be labile for liquidated damages.

## COUNT SEVEN:   RETALITION UNDER THE FAMILY MEDICAL LEAVE ACT

77.    Matlock incorporates by reference paragraphs 1 through 76.

78.    Matlock was an "eligible employee" of CCS and/or CBS within the FMLA's meaning at all relevant times.

79. The FMLA makes it unlawful for employers to discriminate against an individual "for opposing any practice made unlawful" by the FMLA, as well as to discriminate against an individual because the individual participated in an inquiry or hearing under the FMLA. 29 U.S.C. § 2615(a)(2), (b).

80. CCS and CBS retaliated against Matlock for her exercise of rights and/or opposition to unlawful practices under the FMLA. CCS and CBS unlawfully interfered with Button's right to take FMLA leave, in violation of the FMLA, 29 U.S.C. §2601, *et seq.*:

81. CCS and CBS lacked any good-faith basis for its actions or omissions and should be labile for liquidated damages.

## DAMAGES AND OTHER REMEDIES

82. Matlock incorporates by reference paragraphs 1 through 79.

83. CCS and CBS's discrimination and retaliation caused Matlock significant harm. The ADA and FMLA entitle her to be made whole for this harm. She seeks equitable relief necessary to return her to the position that she would have held absent CCS's and/or CBS's unlawful conduct and to protect her and others from discrimination and retaliation.

84. CCS and/or CBS caused Matlock to suffer—and she expects yet to suffer—pecuniary losses, including but not limited to, lost wages and other benefits associated with employment.

85.     As a further result of CCS's and/or CBS's unlawful conduct, Matlock has suffered—and continues to suffer—non-pecuniary losses including, among others, humiliation, damage to professional and personal reputation, undue stress, anxiety, mental distress and anguish, loss of enjoyment of life, and other non-pecuniary losses.

86.     CCS and/or CBS acted with malice or reckless indifference to Matlock's rights. The ADA and TCHRA authorize and demand punitive damages in an amount necessary to punish CCS's and/or CBS's lawbreaking and deter others from violating this key public policy.

87.     CCS and CBS acted willfully, in that they acted with reckless disregard for Matlock's rights under federal law. The FMLA authorizes and demands liquidated damages to punish CCS's and/or CBS's lawbreaking and deter others from violating this key public policy.

88.     CCS's and CBS's unlawful conduct forced Matlock to retain counsel to redress the harms done. Consequently, she seeks attorney's fees, expert costs, costs of suit, and other reasonable litigation expenses.

## CONDITIONS PRECEDENT

89.     Matlock exhausted available administrative remedies under the ADA and the TCHRA. All conditions precedent to recovery on the claims asserted above have been performed, satisfied, met, and exhausted or have been waived.

## VI.    JURY DEMAND

88.    Matlock requests a jury trial on all issues and claims in this case.

## PRAYER FOR RELIEF

WHEREFORE, Matlock prays that Defendant CCS and Defendant CBS be summoned to appear and answer, and that on final trial or summary disposition, the Court enter a judgment for Matlock against CCS and CBS for the following:

a.    A declaration that defendants' actions violated United States and Texas law and that their actions violated Matlock's rights under the ADA, TCHRA, and FMLA.

b.    Equitable relief necessary to permanently and forever prevent defendants and their officers, agents, servants, employees, and anyone in active concert or participation with them, from engaging or acquiescing in the unlawful employment practices alleged above, including but not limited to:

(i)    an order that defendants implement and execute adequate policies, procedures, and programs to prevent and remedy discrimination and retaliation, and to eradicate the effects of their past unlawful employment practices;

(ii)    an order that defendants implement adequate company-wide training on disability discrimination, FMLA rights, and retaliation;

(iii)    Reinstatement to the position and seniority that Matlock would have held but for the discrimination and retaliation, and all other equitable relief necessary to restore her to the position that she would have held but for discrimination and/or retaliation; and front pay if this other equitable relief is not feasible; and

(iv)    Other equitable relief necessary to bring defendants into compliance with – and to remain in compliance with – the law.

c.     Back pay, including but not limited to lost wages and other employment benefits.

d.     Actual damages and compensatory damages in amounts to be determined by the jury at trial based on the evidence.

e.     Punitive damages in an amount sufficient to punish defendants for their lawbreaking and to deter these defendants and other employers from engaging in similar law-breaking.

f.     Liquidated damages in the maximum amount allowed by law.

g.     Pre- and post-judgment interest.

h.     Attorney's fees, expert fees, costs of suit, and other reasonable litigation expenses.

i.     All other legal and equitable relief to which Matlock is justly entitled.

Dated: June __23_, 2021               Respectfully submitted,

GILLESPIE SANFORD LLP

4803 Gaston Ave.
Dallas, Texas 75246
Tel:    214.800.5111
Fax:   214.838.0001

By: /s/ _____
   James D. Sanford
   Texas Bar No. 24051289
   Email: jim@gillespiesanford.com

ATTORNEYS FOR PLAINTIFF
CHRISTIAN F. MATLOCK